**SO ORDERED.**

**SIGNED this 12 day of July, 2011.**

_____
**J. Rich Leonard**
**United States Bankruptcy Judge**

_____

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

IN RE:

3G PROPERTIES, LLC,                             CASE NUMBER: 10-04763-8-JRL
                                                CHAPTER 11
        DEBTOR.

**ORDER**

This matter came before the court on the debtor's request for confirmation of its chapter 11 plan of reorganization, filed on December 13, 2010, and the first and second modifications to the plan, stated orally on the record at the hearing and subsequently filed. A hearing was held on May 19, 2011, continued on May 20, 2011 and May 23, 2011, and concluded on May 24, 2011, in Raleigh, North Carolina. The two secured lenders in this case, Southern Community Bank ("Southern") and Capital Bank ("Capital"), both impaired under the plan, object to confirmation. Both creditors filed supplemental objections to the debtor's second modified plan following the hearing. Those objections are considered herein along with the record before the court at the time of the hearing.

**BACKGROUND**

3G Properties, LLC, the debtor, is the resulting entity from the merger of three separate entities: Lake Glad Road Commercial, LLC; Lake Glad Road Partners, LLC; and, Granville Park

Partners, LLC.  On June 14, 2010, the debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The debtor owns two pieces of real property in Granville and Vance counties; the first is raw land intended for development both as a residential neighborhood and a commercial tract, and the second is raw land to be developed as an industrial park.

Known as Highland Trails, the first property is situated along Highway 56, in the city of Creedmoor near the town of Butner and I-85.  Highland Trails totals approximately 250 acres, and is intended to be a mixed-use community with both residential and commercial portions.  If developed according to the debtor's plan, the commercial portion would encompass 58 acres, while the remaining 192 acres would accommodate approximately 340 residential home sites.  The debtor also owns 510.47 acres of raw land commonly known as Triangle Park North.  This separate real estate project is being developed in connection with the State of North Carolina as an expansion of the Research Triangle Park.

Furthering the proposed development of Triangle Park North, the debtor executed a real estate purchase and sales contract on October 22, 2007, with an international pharmaceutical company known as Protherics, Inc. (the "Protherics Contract").  The Protherics Contract contemplates the purchase of 50 acres of Triangle Park North at a purchase price of $50,000.00 per acre for a total amount of $2,500,000.00.  The Protherics Contract failed to close by the closing date of December 31, 2008; however, the contract was revived by a first amendment executed on April 7, 2010 ( the "Amended Protherics Contract").  Consideration for reviving the contract was an exchange of $1.00.  Under the Amended Protherics Contract, the inspection period and closing date are extended through December 31, 2011.

Southern holds two claims against the debtor, the aggregate amount of which is

$6,767,611.85. The claims are secured by Highland Trails. Capital, secured by Triangle Park North, holds an outstanding claim in the approximate amount of $9,060,000.00. Both Southern and Capital filed ballots rejecting the debtor's proposed chapter 11 plan. The parties challenge the debtor's ability to confirm the proposed plan pursuant to 11 U.S.C. § 1129.

## DISCUSSION

To confirm a plan pursuant to 11 U.S.C. § 1129(b)(1), the court must determine whether the plan is "fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." To determine whether a plan is fair and equitable, the court looks to the requirements of § 1129(b)(2). The standards set forth in § 1129(b)(2) are minimums; therefore, a plan may meet the standard and still not be considered fair and equitable. In re EFH Grove Tower Assoc., 105 B.R. 310, 313 (Bankr. E.D.N.C 1989).

The debtor's plan of reorganization was filed on December 13, 2010. Subsequently, on May 23, 2011 and May 27, 2011, first and second modifications were filed. Southern's claims are treated under classes 5 and 6 in the plan, while Capital's treatment is laid out in class 4. All three classes follow a formula of non-payment in the first two years while interest accrues. In the third and final year of repayment, treatments, pursuant to which remaining balances are paid in full, vary by class. Under these terms, the only way Southern or Capital would receive payment in the two years following the effective date is if the properties were to sell.

With respect to Southern, the debtor intends to surrender the residential tract for a credit of $3 million dollars or such value as the court determines. As of the petition, Southern was secured on the residential tract in the approximate amount of $3,333,519.84. Southern is treated differently on its claim of $3,752,623.83 secured by the commercial tract. The debtor intends to

treat the commercial tract as fully secured up to $2.5 million. Interest would accrue on this amount for a one year period. Then, at the start of the second year, $65,000.00 in accrued interest would be paid from a "member contributed escrow account." The accrued interest unpaid from the member contribution account would remain part of the outstanding balance, towards which interest-only payments will be made in the third year before the three year call. The debtor intends to secure the remainder in the residential tract and the excess in the commercial tract, and any interest accrued thereon, through an assignment of the Goldston Family LP and James Adams, Sr. deeds of trust in Triangle Park North. These assignments would render Southern a junior lien-holder on Triangle Park North behind Capital and Granville County. Granville County's secured claim is approximately $1.4 million.

  Capital's treatment follows the similar approach of non-payment for the first two years. As of the petition, Capital is secured in Triangle Park North in the amount of approximately $9.06 million dollars. If the Amended Protherics Contract closes, the debtor will pre-pay Capital one years worth of interest at 5% from the proceeds of the sale. Following the interest payment, the remaining sale proceeds would be paid toward Capital's claim. However, if the contract fails to close, the debtor proposes to let interest accrue for two years. In the third and final year, the debtor intends to take action to satisfy Capital's claim. The debtor retains three options as a means of satisfaction: refinancing; public auction; or a transfer of property back to Capital sufficient to payoff the remaining balance. Which of the three proposed methods is utilized is determined solely by the debtor.

  Though potentially no payments will be made, interest on the claims will accrue at a fixed rate. This form of repayment is known as negative amortization. In determining whether a

plan that includes negative amortization is fair and equitable, courts apply a ten-factor test. In re The Northern Outer Banks Assoc., LLC, Case No. 10-01292-8-RDD (Bankr. E.D.N.C. Nov. 8, 2010); see also Great Western Bank v. Sierra Woods Group, 953 F.2d 1174, 1178 (9th Cir. 1992) (holding that negative amortization is not per se inequitable but requires a case-by-case determination utilizing the ten factor test). The ten factors considered are:

> (1) Does the plan offer a market rate of interest and the present value of the deferred payments; (2) Is the amount and length of the proposed deferral reasonable; (3) Is there a sufficient equity cushion; (4) Is the plan feasible; (5) Is the collateral appreciating, depreciating, or stable; (6) Are the risks involved unduly shifted to creditors; (7) Are the risks borne by one secured creditor or a class of secured creditors; (8) Does the plan preclude creditors from foreclosing on collateral; (9) Did the original loan terms provide for negative amortization; and, (10) Are adequate safeguards in place to protect secured creditors against plan failure.

Northern Outer Banks, Case No. 10-01292-8-RDD at *18.

Although the term valuation does not appear outright in the list of factors to consider, valuation of the collateral subject to negative amortization is central to the analysis. Here, the linchpin of the debtor's plan is the Amended Protherics Contract and the value it brings to the Triangle Park North property. If the pending sale closes on the terms of the Amended Protherics Contract, then there is arguably an equity cushion which adequately protects both pieces of collateral and supports confirmation. Were the contract to fail, or differ from the terms presented, then valuation of the property becomes a much more difficult task.

**The Amended Protherics Contract**

Dated October 22, 2007, the Protherics Contract provides for the sale of 50 acres within the Triangle Park North property. Under the terms of the agreement, the purchase price per acre is $50,000.00. Protherics, the buyer, placed $20,000.00 in an escrow account as an earnest money deposit. For reasons unexplained, the Protherics Contract expired on its own terms on

December 31, 2008; however, the original purchase and sale agreement was revived on April 7, 2010. The terms of the Amended Protherics Contract state, "[e]xcept as expressly modified hereinabove, each and every term and provision of the [original] Contract is hereby ratified and shall remain in full force and effect." Only the inspection period and closing date were modified by the Amended Protherics Contract, which are extended through December 31, 2011.

At the hearing, counsel for Protherics made an appearance to insure that the debtor assumed the Amended Protherics Contract according to its precise terms. Critically, no representative of Protherics provided any evidence of its intent to actually close on the contract, and counsel's appearance does not alter the terms agreed upon by the parties. In paragraph 10.2 of the original Protherics Contract, entitled Notification of Failure of Contingency, the agreement states that at any time before the expiration of the inspection period, the purchaser may notify the seller that:

> [If] this contingency has not been satisfied for any reason whatsoever, or for no reason, in Purchaser's sole and absolute discretion, then this agreement shall be terminated and any and all Earnest Money and all interest accrued thereon shall be refunded to Purchaser. . . .

A basic tenet of contract law is that a valid contract must be supported by consideration. 17 C.J.S. *Contracts* § 2 (2011). North Carolina courts have held that consideration for an option contract which may be withdrawn on a whim is insufficient. In re McLamb v. T.P. Inc., 173 N.C. App. 586, 591, 619 S.E. 2d 577, 581-82 (2005). Illusory consideration renders a contract non-enforceable. Huttenstine v. Mast, 537 F. Supp. 2d 795, 801 (E.D.N.C. 2008). In McLamb, the plaintiffs were individuals seeking to purchase real estate from the defendant. Each plaintiff signed a reservation agreement requiring a $500 deposit as consideration. The agreement also contained a provision under which the plaintiffs could request cancellation of the agreement and

receive a full refund of the deposit. When the defendant was unable to obtain certain permits for development, it rescinded the agreements and returned deposits. The plaintiffs filed suit seeking specific performance and damages. Following dismissal for failure to state a claim in district court, the plaintiffs appealed. The North Carolina Court of Appeals declined to adopt the view that an option "held open only by a deposit which is (1) refundable at the behest of the depositing party, and (2) to be applied as payment towards the object for which the option is offered if a sale occurs" was supported by adequate consideration. 173 N.C. App. at 592, 619 S.E. 2d at 582. Rendered invalid for lack of consideration, there were no contracts pursuant to which the plaintiffs could allege a breach.

As a general rule, courts should interpret contract terms in a way that upholds the validity of the contract. Huttenstine, 537 F. Supp. 2d 795 at 801. However, the court cannot read into a contract terms which are not there. Here, Protherics, in its sole discretion can ask that the $20,000.00 deposit be returned "*for any reason, or no reason at all*." (Emphasis added). Following McLamb, this language does not support the conclusion that adequate consideration was provided at the execution of the contract.

Moreover, the testimony at the hearing revealed that there are several other similarly situated tracts of land in the same general vicinity as Triangle Park North, all of which are currently marketed for significantly less than $50,000.00 an acre. Nothing in the Amended Protherics Contract prevents the buyer from pursuing a lesser priced property; or, for that matter, taking back the deposit, thereby terminating the current contract, and renegotiating with the debtor under a new contract for terms that reflect the current state of the market. It is unrealistic to think that a buyer in today's market, with the option of walking away from the table without

detriment, would pay an asking price determined in 2007. The court cannot construe a less than 1%, fully refundable deposit as sufficient consideration; nor, does the latter exchange of $1.00 change this conclusion. Whether $1.00 or $20,000.00, Protherics may still decide without risk to terminate the contract. Therefore, the Amended Protherics Contract is given little weight and is not a reasonable factor to consider when valuing the subject properties.

**Valuation**

As finders of fact, bankruptcy courts should determine the best method of ascertaining value, based upon the evidence presented. Assocs. Commer. Corp v. Rash, 520 U.S. 953, 964 (1997). Broken into three classes under the plan, there are primarily two properties at issue — Highland Trails and Triangle Park North. This analysis begins with the Highland Trails property. Having both a residential and commercial tract, the treatment for Highland Trails is divided between the two. The debtor's plan provides for the surrender of the residential portion of Highland Trails in partial satisfaction of Southern's secured interest. Highland Trails consists of 250 acres of mixed use development property in Granville County, North Carolina. Fifty-eight of the 250 acres are designated for commercial use while 192 acres are designated for approximately 340 residential home sites. Highland Trails was appraised by Jonathan Chapman of Keystone Consulting Group in March 2010 and February 2011 ("Keystone Appraisals"). Mr. Chapman was qualified by the court as an expert witness. The 2010 Keystone Appraisal valued the residential portion at $1,810,000 and the commercial portion at $2,270,000 for a total value of $4,080,000. Mr. Chapman applied the sales comparison approach in both Keystone Appraisals. In his professional capacity, Mr. Chapman concluded that the highest and best use of Highland Trails was holding the property for three to five years. This recommendation

derived from Chapman's knowledge of an oversupply of competitive developments and limited demand for new development.

The 2011 Keystone Appraisal only addressed the 192 acre residential portion of Highland Trails. Mr. Chapman identified seven new comparable properties that were not noted in the 2010 Keystone Appraisal. Three of these properties were current listings, one was under contract, and three were sales occurring in the last year. Chapman made downward adjustments to the properties listed for sale to reflect current market conditions. Adjustments were then made for zoning, topography, location, utilities, and size to all seven properties. In conclusion, Chapman valued the residential portion of Highland Trails as of February 25, 2011, at $1,810,000. This is the same value derived using the sales comparison analysis of six different properties in the 2010 appraisal.

In addition to the Keystone Appraisals, the court considered the May 26, 2010, appraisal conducted by Leatherman Real Estate Services. Leatherman's appraisal concluded that the combined value of the Highland Trails residential and commercial tracts was $8,285,000.00. During the hearing, Mr. Leatherman asserted that since conducting the appraisal, he and his company undertook a summary analysis of the overall local real estate market. According to his analysis, land values in the area have declined. Based on market evidence garnered since his 2010 appraisal, Mr. Leatherman testified that the value of the residential tract had declined from $4,535,000.00 to $3,750,000.00.

Because the debtor proposes to surrender the residential tract of Highland Trails for credit, Southern is entitled to the indubitable equivalent of its claim. 11 U.S.C. § 1129(b)(2)(A)(iii). The proposed plan states that the credit shall be $3 million, or an amount

set by the court. In light of the uncertainties involved in valuation, particularly in this market, this court has cautioned that a conservative approach must be taken. In re Bannerman Holdings, LLC, Case No. 10-01053-8-SWH at *7-8 (October 20, 2010). Accordingly, the court accepts the Chapman value of $1,810,000.00 for the surrendered residential portion of Highland Trails.

Analyzing the situation in which real property collateral is partially surrendered, this court, in Bannerman, chose to adopt an analysis of value that included a conservative discount rate of 12%. Id. Discount rates are important as they ensure creditors are compensated for the present value of their claim. "Considering the low level of present-day interest rates, a 12% discount rate would clearly not overstate value and should provide reasonable cushion to the creditor." Id. No evidence was offered by either party as to an appropriate discount rate, so the court will use the 12% figure. Applying this rate of discount to the Chapman appraisal, after first adjusting for a 5% realtor commission, and then discounting by 12% twice, once for each year of the holding period required to sell the property at the determined price, the value of the surrendered residential Highland Trails property rounds to $1.2 million. Neither appraiser gave an updated value for the retained commercial tract, so the court deems the $2.5 million value of the claim secured by the commercial tract to be reasonable. Subtracting these numbers from Southern's total claims, the unsecured portion of the claim approximates $3.3 million. This is the amount for which the debtor offers new security in the form of assigned third and fourth deeds of trust in Triangle Park North. Therefore, the analysis of Triangle Park North's value is critical.

The proposed plan relies on the existence of equity in Triangle Park North to grant Southern new security for its unsecured claims after the residential portion of Highland Trails is

10

surrendered and the secured claim of the commercial tract is set at $2.5 million.  The court takes into consideration three of the appraisals presented at the confirmation hearing when determining the value of the 510 acres known as Triangle Park North. The appraisals considered include two conducted by Williams Appraisers, Inc. dated November 16, 2009, and November 12, 2010 (the "Williams Appraisals"), and one conducted by Kirkland Appraisals dated February 11, 2011 (the "Kirkland Appraisal").  Respectively, the appraised values of Triangle Park North are $15 million, $14 million, and $9.9 million.  "The court has the task of determining the value of the Property, [when] faced with two conflicting appraisal reports." In re Sailboat Props., LLC, 2011 Bankr. LEXIS 1316, *16-17 (Bankr. E.D.N.C. March 31, 2011).

      The Williams Appraisals divided Triangle Park North into two separate tracts for the purpose of valuing the property as a whole. The first tract of 150 acres was labeled the "industrial tract" because a majority of its infrastructure is already completed.  The second tract of 360.47 acres was labeled "excess vacant land" due to its lack of infrastructure.  The Williams Appraisals relied on the sales comparison approach as recognized by the Uniform Standards for Professional Appraisal Practice (USPAP) for assessing the value of real property.  James E. Norman II, who helped prepare both appraisals, was qualified by the court as an expert witness. In the 2009 Williams Appraisal, Mr. Norman identified four comparable properties and made adjustments based on each property's date of sale, location, access/visibility, utilities, infrastructure, and size in order to establish a fair market value of the subject property.  In the 2010 Williams Appraisal, five comparable properties were identified and similar adjustments were made.  However, Mr. Norman noted in both of the Williams Appraisals that "recent sales of similar industrial tracts in the subject market were scarce, [sic] therefore, we expanded our

search area to include surrounding counties." Debtor's Exhibit 1 at 50; Debtor's Exhibit 2 at 52. Although Mr. Norman's appraisal methodology is sound, the Williams Appraisals suffer from the fact that both relied heavily on the pending sale under the Amended Protherics Contract. Debtor's Exhibit 1 at 61, 68; Debtor's Exhibit 2 at 63, 71.

The third appraisal considered by the court was the Kirkland Appraisal. Dated February 11, 2011, the Kirkland Appraisal indicates that it also used the sales comparison approach when coming to the conclusion of Triangle Park North's value. Richard C. Kirkland, Jr. prepared the appraisal and was also qualified by the court as an expert witness. Although the appraisal report states that it follows the sales comparison approach, it does so with respect to only one piece of property. A majority of the appraisal is based on an alternative method known as matched pair analysis. See Capital Bank Exhibit 5 at 39. Under this approach, a property's undeveloped sales price per acre is compared to its single lot developed price per acre in order to establish a comparable discount ratio which is then used to value the entire property. Mr. Kirkland concluded that "[i]ndustrial land has sold poorly over the last few years due to the significant oversupply of existing industrial buildings on the market or vacant for lease." Id. at 48. However, "[t]he few land transactions [considered] show steep drops of around 40% from land value expectations from even just three years ago." Id. Combining his findings under the matched pair analysis with the one property comparable to the subject, Mr. Kirkland concluded that Triangle Park North was valued at $19,000 per acre. After factoring an estimate of the additional infrastructure costs associated with the land, he concluded that the entire 510 acre tract was valued at $9,965,000.

"When two appraisal reports conflict, a court 'must determine the value based on the

credibility of the appraisers, the logic of their analys[es] and the persuasiveness of their subjective reasoning.'" In re Sailboat Props., LLC, at *17 (internal citations omitted). The court finds Mr. Norman's use of the sales comparison method more persuasive than Mr. Kirkland's combined sales comparison and matched pair approach. Nonetheless, history has proved the Williams Appraisals too high. The first appraisal in 2009 opined that the property would sell for $15 million in a two-year exposure period. That has not happened. This problem arises because the Williams Appraisals rely heavily on the Amended Protherics Contract as the primary comparable sale when valuing Triangle Park North. Because the Amended Protherics Contract should be discounted, the court disregards Mr. Norman's use of the Amended Protherics Contract as a comparable sale.[1] Aside from the inclusion of the Amended Protherics Contract, Mr. Norman sufficiently explained in detail each adjustment made in comparing other properties to Triangle Park North.

"The Bankruptcy Code provides no bright-line rule for establishing valuation; however, '[w]here property values have declined . . . as a result of a depressed economy, the court, in valuing the property . . . must look at the situation realistically and in light of the most reasonably commercial disposition of real estate practicable in the circumstances.'" In re 3G Props., LLC, Case No. 10-04763-8-JRL (Bankr. E.D.N.C. November 5, 2010) (quoting 21 Am. Jur. Proof of Facts 3d 769 § 4 (2010)). Triangle Park North has been listed at $15 million for over three years. Other than the Amended Protherics Contract, buyers have shown little to no interest in the property. The Williams Appraisals indicated that an additional 18-month

---

[1] Alternatively, the court notes that the 2011 appraisal makes no downward market adjustment for the Amended Protherics Contract value, even though the testimony is that commercial tracts have declined in the 30% - 40% range.

marketing period would be necessary for the property to sell at the appraised value. Both Mr. Norman and Mr. Kirkland testified that in their professional opinions, they believed the commercial real estate market was close to bottoming out, if it had not done so already. Regardless, the market is expected to remain flat for a few more years before beginning to slowly recover, and will recover more slowly in outlying counties than in the Research Triangle Park area. Though the court declined to apply Mr. Kirkland's overall appraisal methodology, he provided extensive testimony regarding the significant oversupply of existing industrial buildings currently on the market or vacant for lease, and the listing prices of comparable tracts. Overall, the evidence presented indicates that the current asking price of $15 million grossly overvalues the property under the current economic conditions.

Relying on the November 2010 Williams Appraisal, which included four comparable properties, the court recalculates the value of Triangle Park North using the sales comparison method minus the Amended Protherics Contract. After calculating new values for the 150 acre industrial tract and the 360 acre excess land tract, the court used the mean value of the four comparable properties. Due to current economic conditions and the testimony regarding the current state of the market, the mean value appears to be the most accurate indication of value. Therefore, the court concludes that Triangle Park North is valued at $11.1 million.

**Fair and Equitable Treatment**

After determining the value of Triangle Park North, the court turns to the confirmation requirements of 11 U.S.C. § 1129(b)(2). Treatment may be deemed fair and equitable if one of three criteria set forth in § 1129(b)(2)(A) is satisfied. As previously noted, a plan that proposes to pay the present value of secured claims but allows those claims to increase by non-payment

post-confirmation is not, *per se*, unfair. However, negative amortization must be scrutinized closely according to the ten factors identified earlier, keeping in mind the $11.1 million value of Triangle Park North. Here, virtually all of the ten factors cut against the debtor.

      With the value of Triangle Park North set at $11.1 million, there is no equity cushion to support the treatment as proposed. After newly securing Southern's $3.3 million unsecured claim in Triangle Park North by the assignment of the third and fourth deeds of trust, the total amount of claims secured by the property approximates $13.7 million. Southern would not be able to move against this collateral until two years after the effective date. During that time, interest of approximately $1 million would accrue and be added to Capital's secured claim. That amount added to the second position secured claim of Granville County of $1.4 million, on which interest will also accrue, makes it clear that the promise of additional security to Southern is illusory.

      It is also clear that the debtor has no means to meet its obligations except through land sales. The debtor has no equity in property or capital, and its members are unable to meet its obligations out of their personal resources. Further complicating these facts, Southern already procured judgments on the members' guaranties for $6.5 million each. Although Jim Goldston, one of the two members, testified that in general he would attempt to support the plan, his obligation to do so is limited to $65,000 in interest payments to Southern during the second year of deferred interest. This is only a small percentage of the interest that will come due in the deferral period. Thus, factors one through four concerning equity, payment of present value, length of deferral, and feasibility fail to support the debtor's assertion that the plan is fair and equitable.

Furthermore, the record in this case is replete with appraisal testimony. The four appraisers: Chapman, Leatherman, Kirkland, and Norman, all opined that during the four years in which Triangle Park North has already been on the market, it has declined in value. Their testimony also reveals that an upturn in the Granville County or Vance County market is not expected during the next two years, which is the length of further marketing it will take the debtor to sell Triangle Park North at the determined value. At best, the value of Triangle Park North will remain stable over the next two years. If current economic conditions were different, the method of funding a plan by holding property for sale might fulfill confirmation requirements; however, the reality is that Triangle Park North has been on the market for at least four years and Highland Trails for at least two. During the last two years, each property has been listed with reputable and skilled realtors who have produced barely a glimmer of interest, aside from a contract which does not bind the purchaser and thus does not weigh in the debtor's favor. The further reality is that there are multiple tracts of land similar to the subject on the market for substantially less. Therefore, the negative amortization, which was not provided for in original loan documents, and associated risks are borne entirely by the secured creditors who, under the plan, have no right to foreclose while continuing to wait for payment. On these realities, factors five through nine also weigh against the debtor.

As proposed, the plan fails the majority of the factors considered when determining the equatability of a plan built around a negative amortization scheme. Because there is not sufficient equity in the property at issue to support the proposed deferral period of negative amortization, the plan fails to provide secured creditors with the present value of their claims; and, therefore, is not fair and equitable under 11 U.S.C. § 1129(b)(2).

## CONCLUSION

Based on the foregoing the motion for confirmation is **DENIED**. On the record before it, the court does not foresee any change in the debtor's circumstances that would allow it to propose a plan to cure the defects identified herein. Therefore, Capital's motion for relief from stay is **ALLOWED**. Additionally, the court reconsiders its earlier denial of Southern's motion for relief from stay, in the order dated November 5, 2010, and that motion is also **ALLOWED**.

**END OF DOCUMENT**